RAMÓN PACHECO TORRES y CLARIBEL RODRÍGUEZ CANCHANI, recurridos, *v.* ESTANCIAS DE YAUCO, S.E. y YAUCO EXCAVATION CONTRACTORS, peticionarios.

*Número:* CC-2000-916    *Resuelto:* 30 de septiembre de 2003

410

*Juan M. Aponte Castro*, abogado de la parte peticionaria; *María E. Sánchez*, abogada de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR RIVERA PÉREZ emitió la opinión del Tribunal.

Los aquí peticionarios recurren ante nos de una sentencia emitida por el Tribunal de Circuito de Apelaciones, la cual, a su vez, revocó una resolución dictada por el Departamento de Asuntos del Consumidor en un procedimiento iniciado por una querella sobre vicios de construcción. El foro apelativo intermedio dictaminó que los vicios reclamados en la querella por los aquí recurridos eran ocultos y ordenó a los aquí peticionarios el pago de la compensación correspondiente. Nos corresponde determinar si los vicios en cuestión se reputan aparentes por estar manifiestos, aun cuando los adquirentes no pudieran comprender que se trataba de un vicio de la construcción hasta que intervino un ingeniero que contrataron para inspeccionar la residencia. Se hace necesario, además, determinar si los vicios que sufre la estructura en cuestión provocan su ruina funcional. Veamos.

I

El Sr. Ramón Pacheco Torres y la Sra. Claribel Rodríguez Canchani (adquirentes) compraron una propiedad en la Urbanización Estancias de Yauco, del Municipio de Yauco, Puerto Rico. Los vendedores de dicha propiedad fueron Estancias de Yauco, S.E. y Yauco Excavation Constructors

(vendedores).[1] El precio de venta de dicha propiedad fue setenta y siete mil cien dólares.[2] Surge de los autos ante nos que los adquirentes inspeccionaron la propiedad en cuestión al menos dos veces antes de aceptarla y no notificaron los defectos objeto de la presente controversia a los vendedores.

Por motivo de que en la marquesina de la casa se le estancaba el agua, los adquirentes contrataron los servicios del Ing. Julio E. Caraballo Caraballo el 1 de abril de 1998. Le solicitaron que realizara un estudio de niveles en su residencia.[3] Luego de realizar el correspondiente estudio de la residencia, el ingeniero Caraballo Caraballo encontró graves fallas de construcción.[4] Entre las faltas descubiertas se encuentran las siguientes: (1) descuadre en los dormitorios y diferentes dependencias de la residencia, reflejados en las losetas y paredes de ésta; (2) pendiente del *driveway* que excede en un cuatro por ciento el máximo permitido, que es de catorce por ciento; (3) ausencia de escalera en el área del *foyer* o balcón, la cual consta en los planos aprobados por A.R.Pe., y (4) la construcción de un enorme muro en la parte posterior del solar que no consta en el *plot plan* de la residencia.[5] El ingeniero concluyó que algunos de esos defectos eran insubsanables y otros podían ser corregidos.[6] *De la transcripción de la vista administrativa que obra en autos surge que el ingeniero Caraballo Caraballo declaró que los defectos de los que adolecía la residencia no podían ser reconocidos por una persona que no tuviera pericia en los asuntos de la construcción.*

El 27 de abril de 1998 los adquirentes presentaron una querella ante el Departamento de Asuntos de Consumidor (D.A.Co.), en la cual alegaron que su casa adolecía de los

---

[1] Apéndice, pág. 67.

[2] Íd.

[3] Íd., pág. 68.

[4] Íd.

[5] Íd.

[6] Íd.

defectos siguientes: (1) descuadre interior en toda la residencia que se refleja en las losetas; (2) doble pared en área de comedor y dormitorio Núm. 3; (3) muro de contención más elevado que el de las demás residencias y que no está contemplado en el *plot plan*, y (4) ausencia de escalera en el área del *foyer*, la cual surge del *plot plan* y es necesaria debido a la elevación existente entre la residencia y la acera. Solicitaron que D.A.Co. le ordenara a los vendedores la reparación de los vicios que fueran subsanables y que se les compensara por aquellos vicios insubsanables.[7]

El 20 de mayo de 1998 el Sr. José E. Vives, inspector de D.A.Co., realizó una inspección de la residencia en cuestión. Luego de esta inspección, rindió un informe en el que indicó que en efecto encontró que existían los defectos alegados y realizó un estimado para la reparación de éstos, que ascendía a la suma de veintiséis mil setecientos sesenta dólares con veinticinco centavos.[8]

El 16 de febrero de 1999 se celebró la vista administrativa ante D.A.Co. en el caso de epígrafe. La Jueza Administrativa emitió la resolución en el caso el 27 de abril de 1999, copia de cuya notificación se archivó en autos ese mismo día.[9] Determinó el foro administrativo que la residencia se encontraba en estado de ruina funcional, toda vez que los defectos probados excedían la medida de las imperfecciones que se puede esperar en una construcción. Para llegar a dicha determinación, el referido foro tomó en consideración todos los defectos probados en conjunto, es decir, tanto los vicios ocultos como los vicios aparentes por incumplimiento de contrato.[10] Por lo tanto, concluyó el

---

[7] Íd., pág. 13.

[8] Íd., págs. 50–55.

[9] Íd., págs. 67–71.

[10] En dicha resolución, el Departamento de Asuntos del Consumidor (D.A.Co.) dispuso lo siguiente:

"Los defectos probados en el presente caso exceden las medidas de imperfección. La pendiente del 'driveway' excede en un 4% al máximo permitido que es de 14%. El descuadre interior de las losetas y paredes del interior de la residencia no tiene arreglo, a no ser que se construya nuevamente la casa. En cuanto a los defectos que

foro administrativo que los vendedores eran responsables por los vicios de construcción que sufría la residencia en cuestión, ya que éstos estaban cubiertos por el plazo decenal que establece el Art. 1483 del Código Civil.[11] La resolución de D.A.Co. condenó a los vendedores a pagar la suma de cuatro mil seiscientos cincuenta y cinco dólares a los adquirentes por concepto de depreciación de la residencia por los vicios de los que adolece su estructura. Ordenó, además, la construcción de la escalera en el área del *foyer.*

El 17 de mayo de 1999 los vendedores presentaron una moción de reconsideración ante D.A.Co. En ésta alegaron, en síntesis, que no aplicaba el Art. 1483 del Código Civil, *supra,* a los vicios alegados, porque éstos estaban manifiestos al momento en que los adquirentes aceptaron la propiedad.[12] La moción de reconsideración fue acogida por D.A.Co. y, como consecuencia, el 16 de agosto de 1999 emitió una nueva resolución que dejó sin efecto la resolución original. El foro administrativo determinó que los descuadres en la residencia y la pendiente del *driveway* eran *vicios aparentes,* por lo que al no reclamarlos dentro del plazo de dos años que dispone la Ley Núm. 130 de 13 de

afectan la utilización y disfrute de la propiedad, quedó probado que el enorme muro de contensión [sic] en la parte trasera del solar —que no constaba en los planos aprobados por ARPE— podía construirse de un tamaño menor sin afectar el disfrute del terreno y el espacio del mismo. También impide el disfrute de la edificación la falta de construcción de una escalera que da acceso al balcón y que constaba en los planos de la residencia aprobados por ARPE." Apéndice, pág. 69.

Concluyó, además, la referida agencia administrativa lo siguiente:

"En el asunto que nos ocupa, entendemos que la parte querellante probó a nuestra satisfacción que los vicios de construcción presentes en su residencia cumplen con los requisitos de una ruina funcional, ya que resultaría oneroso corregir dichas imperfecciones o vicios, según la prueba presentada. Demostró que estos vicios que exceden de las imperfecciones que cabe esperar en una construcción le causan perjuicios, ya que deprecian el valor de propiedad. Además, estamos ante la presencia de un incumplimiento de contrato en vista de que parte de la obra no se ajusta a los planos aprobados por ARPE. Toda obligación consiste en dar, hacer o no hacer alguna cosa. Art. 1041 del Código Civil. En este caso el contratista debió construir una escalera en el área del foyer o balcón, la cual constaba en los planos aprobados por ARPE y no lo hizo. Por el contrario, la parte querellada se limitó a tratar de establecer que la querellante 'conocía el estado de la unidad de vivienda y la aceptó tal cual estaba'." Íd., págs. 69–70.

[11] 31 L.P.R.A. sec. 4124.

[12] Apéndice, págs. 72–77.

junio de 1967,([13]) y el Reglamento para Regular las Distintas Actividades que se Llevan a Cabo en el Negocio de la Construcción de Viviendas Privadas en Puerto Rico,([14]) la acción caducó. No obstante, D.A.Co. determinó que la falta de la escalera del *foyer* que aparecía en los planos aprobados por A.R.Pe. y la construcción del muro de contención que no aparecía en el *plot plan* constituían una violación contractual y ordenó la compensación a los adquirentes, ascendente a la suma de ochocientos dólares por ese concepto. Copia de su notificación fue archivada en autos ese mismo día.([15])

Inconformes con la determinación de D.A.Co., los vendedores acudieron ante el Tribunal de Circuito de Apelaciones mediante un recurso de revisión el 15 de septiembre de 1999.([16]) Ese mismo día acudieron ante el mismo foro los adquirentes mediante un recurso similar.([17]) Luego de varios trámites procesales, que incluyeron la consolidación de ambos recursos y la presentación de una exposición narrativa estipulada de la prueba, el foro apelativo intermedio dictó sentencia el 28 de agosto de 2000, copia de cuya notificación se archivó en autos dos días después.([18]) Dicho tribunal concluyó que los vicios de construcción que fueron objeto de la querella eran vicios ocultos y provocaron la ruina funcional de la residencia, por lo que revocó la resolución de D.A.Co. dictada en reconsideración y confirmó la resolución original dictada por esa agencia.([19])

Los vendedores presentaron oportunamente una Solicitud de Reconsideración ante el Tribunal de Circuito de Apelaciones.([20]) Por su parte, los adquirentes presentaron

---

([13]) 17 L.P.R.A. sec. 501 *et seq.*

([14]) Reglamento Núm. 2268 del Departamento de Asuntos del Consumidor de 17 de agosto de 1977.

([15]) Apéndice, págs. 78–81.

([16]) Íd., pág. 82.

([17]) Íd., pág. 1.

([18]) Íd., pág. 196.

([19]) Íd.

([20]) Íd., pág. 216.

una Réplica a Moción de Reconsideración el 27 de septiembre de 2000.[21] Dicho tribunal declaró "no ha lugar" la Solicitud de Reconsideración mediante Resolución de 22 de septiembre de 2000, notificada a las partes y archivada en autos el 2 de octubre del mismo año.[22]

Inconformes con la determinación del foro apelativo intermedio, los vendedores acuden ante nos vía un recurso de *certiorari* presentado oportunamente, señalando como error cometido por dicho tribunal lo siguiente:[23] "Erró el [h]onorable Tribunal al aplicar el Artículo 1483 del Código Civil y al determinar que las condiciones de la residencia equivalen a una ruina funcional."

Con el beneficio de la comparecencia de ambas partes, resolvemos.

## II

El umbral de nuestro análisis tiene que estar dirigido a evaluar y resolver si la residencia de los adquirentes se encuentra en estado de ruina funcional. Esta determinación es imperativa en este caso, ya que de no ser esa la situación, no aplicaría el Art. 1483 del Código Civil, *supra*.

El referido Art. 1483 del Código Civil, *supra*, establece la responsabilidad de un contratista por los vicios de construcción que provoquen la ruina del edificio.

El estatuto antes citado dispone lo siguiente:

> El contratista de un edificio que se arruinase por vicios de la construcción, responde de los daños y perjuicios si la ruina tuviere lugar dentro de diez (10) años, contados desde que concluyó la construcción; igual responsabilidad, y por el mismo tiempo, tendrá el arquitecto que la dirigiere, si se debe la ruina a vicios del suelo o de la dirección.

---

[21] Íd., pág. 225.

[22] Íd., pág. 223.

[23] Petición de *certiorari*, pág. 5.

Si la causa fuere la falta del contratista a las condiciones del contrato, la acción del [sic] indemnización durará quince (15) años.

■ Esta disposición estatutaria ha sido interpretada en varias ocasiones por esta Curia. Hemos resuelto que, para poder reclamar al amparo de ese artículo, el promovente tendrá que demostrar que los vicios que sufre el edificio ocasionan su ruina.[24] De la misma forma, hemos establecido la existencia de cuatro tipos distintos de ruina que puede sufrir un edificio, a saber: ruina total, ruina parcial, amenaza de ruina y ruina funcional.[25]

Cada una de estas categorías de ruina entrañan sus características propias. Existe ruina total cuando se compromete la solidez o estabilidad del edificio.[26] La ruina parcial provoca el derrumbamiento de uno de los elementos estructurales del edificio, pero no la totalidad de éste.[27] La amenaza de ruina implica la degradación parcial de los elementos del edificio que, a su vez, compromete su solidez estructural o parte de ésta.[28]

■ A pesar de esto, no es necesario que los vicios de construcción que afectan un edificio amenacen su estabilidad para que se considere que éste está en ruina.[29] Se considera que *un edificio se encuentra en estado de ruina funcional* cuando los vicios de los que adolece: (1) amenazan la seguridad pública o estabilidad del edificio; (2) le causan un perjuicio grave al dueño; (3) tornan la obra en impropia para el uso a que se le destina, o (4) *exceden las medidas de las imperfecciones que cabe esperar razonable-*

---

[24] *Rivera v. A & C Development Corp.*, 144 D.P.R. 450 (1997); *Maldonado Pérez v. Las Vegas Dev.*, 111 D.P.R. 573 (1981); *Federal Ins. Co. v. Dresser Ind., Inc.*, 111 D.P.R. 96 (1981); *Géigel v. Mariani*, 85 D.P.R. 46 (1962).

[25] *Rivera v. A & C Development Corp.*, supra.

[26] *Fantauzzi v. Pleasant Homes, Inc.*, 113 D.P.R. 132 (1982).

[27] Íd.

[28] Íd.

[29] *Federal Ins. Co. v. Dresser Ind., Inc.*, supra.

*mente en una construcción.*([30]) La presencia de cualquiera de estas situaciones en una construcción produce un estado de ruina funcional. El hecho de estar la estructura en ese estado no implica que estén amenazados de ruina sus elementos vitales. No obstante, se afecta severamente su utilización y disfrute.([31])

■      Una vez el dueño del edificio presenta prueba que demuestre que los vicios de construcción que sufre el edificio provocan alguno de los tipos de ruina antes mencionados, se activa una presunción de culpa, de negligencia o de ambas en contra del contratista que tuvo a su cargo la construcción.([32]) Le corresponde entonces al contratista presentar prueba que demuestre la inexistencia de la ruina o que ésta no fue causada por su negligencia, o ambas.([33]) Por lo tanto, se trata de una presunción *iuris tantum*, la cual tiene que ser rebatida por la parte en contra de la cual ésta opera, o sea, el contratista.([34]) Si no se presenta prueba para rebatir el hecho básico que da lugar a la presunción, el juzgador está obligado a dar por probado el hecho presumido.([35])

De la prueba desfilada en la vista administrativa se desprende que en efecto el edificio en cuestión en el caso de autos padece de ruina funcional. Definitivamente, los defectos de los que adolece dicho edificio exceden por mucho los que pueden esperarse razonablemente de una construcción similar. De la misma forma, los defectos restringen el uso que le pueden dar sus dueños (los adquirentes) a la estructura. Esta conclusión encuentra apoyo en el testimonio creído del perito presentado por los adquirentes ante

---

([30]) *Rivera v. A & C Development Corp.*, supra; *Fantauzzi v. Pleasant Homes, Inc.*, supra.

([31]) Íd.

([32]) *Rivera v. A & C Development Corp.*, supra.

([33]) Íd.

([34]) Íd.

([35]) Regla 14 de Evidencia de Puerto Rico, 32 L.P.R.A. Ap. IV; *Pueblo v. Vázquez Méndez*, 117 D.P.R. 170 (1986).

D.A.Co., el cual declaró que para poder corregir los descuadres en la residencia en cuestión habría que reducir su espacio interior, lo cual limitaría el disfrute de la estructura por parte de los aquí recurridos. No podemos perder de vista que al adquirir la residencia, los adquirentes tenían la expectativa de disfrutar de una cantidad determinada de pies cuadrados de espacio.

Los adquirentes se han visto imposibilitados de utilizar la marquesina de la residencia, por razón de que el declive en la entrada de ésta (*driveway*) es mayor que el permitido en la industria. Por eso, no pueden estacionar su automóvil dentro de la referida marquesina, lo cual les obliga a dejarlo estacionado en la calle. Tampoco han podido utilizar la entrada principal de la residencia que ubica en el balcón, por razón de la ausencia de la escalera que daría acceso de la acera al *foyer*, tal y como aparece establecida en el plano de la residencia. Por otro lado, el muro de contención construido en la parte posterior de la residencia, el cual no aparecía en el *plot plan*, le imposibilita a los adquirentes el disfrute del patio posterior de la residencia que, según se les había representado, habrían de disfrutar una vez compraran el inmueble.

Las anteriores conclusiones están apoyadas por los testimonios del perito y de la señora Rodríguez Canchani en la vista administrativa ante D.A.Co.[36] La parte peticionaria (los vendedores) no aportó prueba alguna para refutar el hecho básico de que la residencia se encuentra en estado de ruina funcional ni demostró que ese estado no se debió a su culpa o negligencia. Por esta razón, es necesario dar por probado el hecho presumido de que la ruina funcional de la residencia en efecto existe y que fue producida por los vendedores.

---

[36] Los referidos testimonios surgen de la copia de la transcripción de la vista que obra en autos.

## III

Establecido que el edificio sobre el cual gira la controversia en este caso está en ruina funcional, nos corresponde determinar si los vicios de los cuales padecía eran aparentes. Veamos.

■ A pesar de que el Art. 1483 del Código Civil, *supra*, no hace distinción entre los vicios ocultos y los aparentes a la hora de imponer responsabilidad al contratista por la ruina de un edificio, hemos establecido que una vez aceptada la obra dicha responsabilidad opera solamente para aquellos vicios de construcción que sean ocultos o que no hayan podido ser detectados al momento de comprar el bien inmueble.[37] No obstante, la determinación de qué constituye un vicio oculto no es tarea fácil ni existe una fórmula matemática que nos ayude a realizar el análisis crítico. Por esa razón, es necesario hacer la determinación caso a caso.[38]

■ Los vicios aparentes en una estructura, para efectos de la responsabilidad del contratista por ruina, son aquellos que son perceptibles a simple vista y que el dueño no puede evitar reconocer, de acuerdo con su pericia al momento de inspeccionar la obra.[39] A esos efectos, expresamos en *González v. Agostini*, supra, págs. 520–521, lo siguiente:

---

[37] *Constructora Bauzá, Inc. v. García López*, 129 D.P.R. 579 (1991); *Pereira v. I.B.E.C.*, 95 D.P.R. 28 (1967); *González v. Agostini*, 79 D.P.R. 510 (1956).

[38] A pesar de que en *González v. Agostini*, supra, establecimos la norma de que el Art. 1483 del Código Civil, *supra*, aplica cuando se trata de vicios ocultos que provocan la ruina, la doctrina extiende la responsabilidad del contratista por la ruina de la estructura, aun cuando el vicio es aparente. Todo esto en función del interés público apremiante que existe detrás de dicha disposición estatutaria. Véanse: I. Rocca y G. Sabbatiello, *Responsabilidades en la construcción: derechos y obligaciones*, Buenos Aires, Bias Editora, 1986; J. Herrera Catena, *Responsabilidades en la construcción: responsabilidad decenal de técnicos y constructores*, Granada, Gráficas del Sur, 1974, T. I, Vol. I.

[39] *Constructora Bauzá, Inc. v. García López*, supra; *González v. Agostini*, supra.

Los autores franceses, [sic] y la jurisprudencia de su país sostienen que para que el arquitecto o empresario sean responsables dentro del plazo de garantía fijado por la ley es condición que se trate de vicios ocultos. A juicio de algunos de ellos, la existencia de vicios aparentes que el propietario no ha podido ignorar en el momento de la recepción de la obra no implica responsabilidad alguna para el arquitecto o empresario. "Hay que presumir que una obra recibida sin reparos no tenía vicios aparentes". Si los vicios fueran aparentes de modo que el que examina y recibe las obras pudo reconocerlos, no se está ya en el caso del artículo que fija el plazo de garantía sino que se vuelve a la regla común según la cual la recepción de la obra descarga al obrero de la responsabilidad.

La cuestión que discutimos tiene importancia en la decisión de este caso porque como se recordará, cuando el demandante recibió el edificio ya conocía los vicios de construcción que motivan esta reclamación de daños y perjuicios. Si la recepción se hubiera hecho a plena satisfacción o sin reservas, el contratista, conforme a la doctrina expuesta anteriormente, hubiera quedado libre de responsabilidad por los vicios manifiestos que eran conocidos por el propietario ya que dicha aceptación implicaba una renuncia a reclamar por tales vicios. No así en cuanto a los vicios ocultos. Pero según hemos visto, el demandante protestó de los vicios ostensibles que conocía e hizo la recepción del edificio sujeto a esa reserva. (Escolios omitidos.)

■ *La exención de responsabilidad que beneficia al contratista por los vicios aparentes, luego de la recepción de la obra, implica que el dueño de ésta los observó y reconoció como vicios de construcción al verificarse la inspección y la recepción de la obra. Si el vicio de construcción está manifiesto y aparente, pero no puede ser reconocido como tal por el dueño de la obra por su falta de pericia al momento de aceptarla, el contratista no queda eximido de su responsabilidad.*([40])

Concluimos que parte de los vicios de los que adolecía la residencia en cuestión no podían ser reconocidos por los adquirentes por su falta de pericia. El perito de los aquí recurridos declaró en la vista administrativa que los descuadres interiores de la residencia, así como los problemas

---

([40]) La doctrina reconoce que, una vez aceptada la obra por el dueño, el contratista se libera de responsabilidad por aquellos vicios que hayan podido ser reconocidos por el dueño de la obra antes de aceptarla. Véase J.I. Rubio San Román, *La responsabilidad civil en la construcción*, Madrid, Ed. COLEX, 1987.

con el *driveway* no podían ser apreciados por una persona que no tuviera pericia en los aspectos de la construcción. Como cuestión de realidad, no se estableció en la vista ni tampoco en los escritos ante nos que la señora Rodríguez Canchani, la cual inspeccionó la residencia, tuviera la pericia para ello. La residencia fue aceptada sin reparos por la señora Rodríguez Canchani. No es hasta que se le comienza a acumular agua en la marquesina y que tienen problemas para subir su carro a ésta, que contrata un ingeniero para que la inspeccione. En el momento en que un profesional de la construcción le informa de la existencia de tales defectos, es cuando éstos se manifiestan como aparentes a los aquí recurridos. Una vez advienen en conocimiento de los defectos de construcción de su residencia reclamaron la reparación de éstos.

■   Debido al interés público que representa la industria de la construcción y el poderío económico de las empresas dedicadas a esa operación de negocios frente al consumidor, resulta injusto el imponerle a este último la carga de pagar los honorarios de un perito que los acompañe a la hora de inspeccionar la estructura que pretende adquirir como su hogar. No podemos depositar sobre los hombros del consumidor el riesgo de perder su derecho a reclamar por los vicios de construcción que padece su residencia y que ocasionan su ruina, porque no puede reconocer su manifestación por su falta de pericia. Es a los constructores de hogares a quienes les corresponde cumplir con los parámetros de calidad necesarios y asegurarse que las viviendas que construyen, como un negocio lucrativo, puedan ser disfrutadas plenamente por los consumidores que las adquieren.

## IV

■   Una vez establecido el hecho de que la residencia en cuestión se encuentra en estado de ruina funcional, nos corresponde analizar la razón por la cual, en este caso, no

aplican las disposiciones del Reglamento Núm. 2268 del Departamento de Asuntos del Consumidor, *supra*. En primer lugar, ese reglamento dispone en su Sec. 25, pág. 37, una cláusula de salvedad que establece que

> [n]ada de lo dispuesto en este Reglamento se interpretará como una restricción, limitación o renuncia al derecho que por el Código Civil de Puerto Rico, o por cualquier otra ley, se concede a los casos de reclamaciones cubiertas por este Reglamento.

La única disposición estatutaria, adicional al reglamento antes citado, que aplica en el caso ante nuestra consideración es el Art. 1483 del Código Civil, *supra*, que dispone para las reclamaciones en casos de ruina en una estructura. Por lo tanto, el Reglamento Núm. 2268, *supra*, no restringe ni prohíbe que un consumidor, cuya residencia se encuentra en estado de ruina debido a vicios de la construcción, reclame al amparo de lo dispuesto en el Código Civil. Del texto del reglamento surge claramente que su propósito es permitir, en aquellos casos en que una residencia sufre de vicios de construcción, que el dueño pueda reclamar al contratista o desarrollador sin necesidad de probar que el edificio se encuentra en estado de ruina, como tendría que hacerlo en caso de presentar su reclamación al amparo del Art. 1483 del Código Civil, *supra*.

En el caso ante nos, la situación es totalmente distinguible de aquellas cubiertas por el referido reglamento. Se trata de una residencia que se encuentra en estado de ruina funcional, según lo demostrado por la prueba presentada en la vista administrativa, la cual no fue rebatida por los aquí peticionarios. Los vicios de los cuales adolecía la referida estructura estuvieron ocultos para los adquirentes por un tiempo mayor que el establecido por el referido reglamento, razón por la cual era imposible reclamar al amparo de éste. Por lo tanto, tratándose de una situación fáctica totalmente distinta de aquella que provee el Reglamento Núm. 2268, *supra*, éste no aplica en este caso.

# V

Además de los vicios arriba mencionados, la residencia en cuestión padecía de defectos de construcción que no se pueden reputar como ocultos, ya que éstos podían ser apreciados a simple vista. La ausencia de la escalera que debió dar acceso al *foyer* y la construcción del muro de contención en la parte posterior de la residencia podían ser apreciados a simple vista. A pesar de que esos vicios de construcción eran apreciables a simple vista, el contratista no se liberó de su responsabilidad por éstos con la aceptación de la residencia por los adquirentes. Veamos.

El Art. 1483 del Código Civil, *supra*, en su segundo párrafo, dispone que "[s]i la causa [de la ruina] fuere la falta del contratista a las condiciones del contrato, la acción del [sic] indemnización durará quince (15) años". Esta disposición estatutaria extiende, más allá del plazo decenal, el término que tienen los adquirentes de una estructura para reclamar contra el contratista los vicios de construcción que sufre la estructura, cuando éstos son producto de una violación contractual.[41]

Al interpretar la referida disposición, esta Curia resolvió en *Federal Ins. Co. v. Dresser Ind., Inc.*, supra, que "para poder invocar el plazo de caducidad mayor *deberá probarse que la violación a una cláusula concreta del contrato o sus especificaciones fue la causa directa de la ruina del edificio.*"[42] El peso de la prueba para demostrar estas circunstancias recae en el dueño del edificio.[43] A esos efectos, expresamos lo siguiente:

> Por tratarse de una cláusula punitiva, que tiene el extraordinario efecto de ampliar el plazo decenal, la prueba no podrá fundarse en simples inferencias derivables de la caída del

---

[41] *Federal Ins. Co. v. Dresser Ind. Inc.*, supra.

[42] Íd., pág. 108.

[43] Íd.

ascensor. La falta del contratista tiene que ser probada por el comitente.[44]

Unos años más tarde, en *Zayas v. Levitt & Sons of P.R., Inc.*, 132 D.P.R. 101 (1992), resolvimos que para que se configure una acción bajo el segundo párrafo del referido artículo, es indispensable que se pruebe la existencia de un contrato de obra o de construcción. Hemos definido el contrato de obra, también denominado "contrato de arrendamiento de obra o de ejecución de obra", como sigue:

> En estos casos una parte, generalmente denominada "contratista", se compromete a realizar y entregar una obra o construcción según la misma fue contratada, mientras que la otra parte, el dueño, se obliga a pagar el precio convenido en la forma y el tiempo así pactado.[45]

Ahora bien, es menester evaluar y analizar en qué circunstancias la aceptación del edificio por el dueño de la obra libera al contratista de responsabilidad por los "vicios aparentes". Juan Herrera Catena explica que la doctrina se divide en dos posiciones: la que opina que la aceptación o recepción definitiva libera de responsabilidad por los vicios ruinógenos aparentes, pero no por los ocultos, y la que postula que la recepción definitiva no cubre ningún vicio que cause la ruina, ya sea éste oculto o aparente.[46] En cuanto a la primera postura, Herrera Catena explica que sus proponentes, aun cuando entienden que la recepción definitiva cubre los vicios ruinógenos aparentes "exigen a éstos tales requisitos que hacen muy difícil la prueba de que el vicio en cuestión tenga tal carácter".[47] Por su parte,

---

[44] Íd.

[45] *Constructora Bauzá, Inc. v. García López,* supra, pág. 592.

[46] J. Herrera Catena, *op. cit.*, pág. 86.

[47] Herrera Catena explica que los proponentes de la primera postura exigen los requisitos siguientes: (1) que el vicio sea aparente para el propietario y que éste, por sí mismo, pueda constatarlo y apreciar su importancia, y (2) que los vicios no hayan podido escapar a un no técnico, por ser evidentes en el momento de la recepción. Más aún, algunos autores proponen que el contratista tenga el peso de la prueba para demostrar que los vicios eran aparentes al momento de la recepción del edificio y que el propietario conocía su existencia. Herrera Catena, *op. cit.*, págs. 86–87.

Herrera Cantena suscribe la segunda postura, al explicar que el Art. 1.591 del Código Civil español, Art. 1483 nuestro, *supra*, aplica indistintamente a los vicios ocultos u aparentes, *siempre que ocasionen la ruina del edificio*.[48] Concluye que el texto de la referida disposición, en sus dos párrafos, no autoriza la distinción entre vicios ruinógenos ocultos y aparentes.[49] Señala, además, que las consideraciones de orden público que apoyan la responsabilidad decenal impiden que la recepción definitiva libere al contratista de responsabilidad por los vicios ruinógenos aparentes.[50] Con relación al segundo párrafo del referido artículo, Herrera Catena justifica su conclusión de que la recepción definitiva no cubre ningún tipo de vicio ruinógeno, al expresar lo siguiente:

1) Si el contratista y el arquitecto responden ante terceros, aunque se tratare de un vicio aparente en el momento de la recepción de obra no es (en nuestra opinión) porque el párrafo 1.° del precepto contemple obligaciones de origen extracontractual, sino porque el art. 1909 del propio Código [Artículo 1809 del Código Civil de Puerto Rico] (típicamente extracontractualista) se remite al art. 1.591 (en sus dos párrafos, y no sólo a su párrafo 1.°), preceptuando que "si el daño de que tratan los dos artículos anteriores (ruina del 1.907 [Artículo 1.807 nuestro] y daños relacionados en el 1.908) [Artículo 1.808 nuestro]) resultare por defecto de construcción, *el tercero que lo sufra* sólo podrá repetir contra el arquitecto o, en su caso, contra el constructor, dentro del tiempo legal". Es indiferente que la causa (para responder ante terceros) sea una de las detalladas en el párrafo 1.° del art. 1.591 o "la falta del contratista a las condiciones del contrato" (a que se refiere el párrafo 2.° de este precepto); pues el genérico "defecto de construcción" (del art. 1909) se concreta en todas y cada una de las causas de ambos párrafos del art. 1.591 ....

. . . . . . .

2) Estimamos que el párrafo 2.° del art. 1.591 no viene a contradecir la doctrina tradicional sobre el carácter liberatorio de la recepción de obra, sino que, por el contrario, constituye uno de los supuestos de *excepcionalidad* (al principio general liberatorio) en que se desenvuelve dicho precepto, siquiera

---

[48] Herrera Catena, *op. cit.*, pág. 93.

[49] Íd.

[50] Íd., págs. 93 y 101.

tenga un sentido *punitivo* y de agravación (respecto al párrafo 1.°) la ampliación del plazo de garantía decenal al de 15 años, que ya existiera en el Derecho romano y en nuestra Ley de Partidas, conservándose en el párrafo 2.° del precepto. (Énfasis en el original y escolios omitidos.)[51]

■ A la luz de lo antes expuesto, forzoso es concluir que la recepción definitiva del edificio no libera al contratista de responsabilidad por los vicios que causan la ruina del inmueble, sean éstos ocultos o aparentes, cuando estos últimos, perceptibles a simple vista, constituyen un incumplimiento del contrato de construcción.

Del expediente surge que la escalera que habría de permitir acceso al *foyer* aparecía en los planos que aprobó A.R.PE., por lo que era una obligación contractual de los vendedores construir la residencia según lo disponen esos planos. No hacerlo constituyó una violación de los términos y las condiciones del contrato de parte de los vendedores para con los adquirentes. Por otro lado, el muro de contención que se construyó en la parte posterior de la residencia no constaba en el *plot plan*. Al construirlo se limitó la cantidad de terreno que los adquirentes podían disfrutar y que en efecto compraron. Concluimos que los vendedores violaron los términos y las condiciones contractuales pactados con los adquirentes. De acuerdo con lo dispuesto en el segundo párrafo del Art. 1483 del Código Civil, *supra*, el término para entablar la reclamación es de quince años en los casos en que se produce la ruina funcional de una edificación construida para vivienda como consecuencia de los referidos "vicios aparentes" —producto del incumplimiento del contrato de construcción— junto a los vicios ocultos ya mencionados.[52]

---

[51] Íd., págs. 96–97.

[52] Hemos aplicado el Art. 1483, *supra*, en su segundo párrafo, pues, como mencionáramos anteriormente, los "vicios aparentes" por incumplimiento de contrato, junto a los vicios ocultos anteriormente mencionados, causaron el estado de ruina funcional de la vivienda. No obstante, aunque dicho artículo no aplicara con relación al incumplimiento de los términos y condiciones del contrato, el contratista respondería bajo el Art. 1077 del Código Civil, 31 L.P.R.A. sec. 3052, el cual dispone lo siguiente:

## VI

■ Es norma firmemente establecida que los tribunales apelativos han de conceder una gran deferencia a las decisiones de las agencias administrativas, debido a que éstas cuentan con vasta experiencia y con los conocimientos especializados en los asuntos que le han sido encomendados.[53] Hemos resuelto que en nuestra jurisdicción los procedimientos y las decisiones de las agencias administrativas gozan de una presunción de regularidad y corrección.[54] Por lo tanto, la persona que alegue lo contrario no puede descansar únicamente en meras alegaciones y tendrá que presentar evidencia suficiente para derrotar tal presunción.[55]

■ La revisión judicial de una decisión administrativa suele circunscribirse a determinar si: (1) el remedio concedido por la agencia fue apropiado; (2) las determinaciones de hecho realizadas por la agencia están sostenidas por evidencia sustancial en el expediente administrativo, y (3) las conclusiones de derecho fueron correctas.[56]

---

"La facultad de resolver las obligaciones se entiende implícita en las [obligaciones] recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe.

"El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible.

"El tribunal decretará la resolución que se reclame, a no haber causas justificadas que le autoricen para señalar plazo.

"Esto se entiende sin perjuicio de los derechos de terceros adquirentes, con arreglo a las secs. 3496 y 3499 de este título, y las disposiciones de la Ley Hipotecaria y el Registro de la Propiedad, secs. 2001 *et seq.* del Título 30."

[53] *T-JAC, Inc. v. Caguas Centrum Limited*, 148 D.P.R. 70, 80 (1999); *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64, 130 (1998).

[54] *Rivera Concepción v. A.R.Pe.*, 152 D.P.R. 116 (2000); *Com. Vec. Pro-Mej., Inc. v. J.P.*, 147 D.P.R. 750, 761 (1999); *Misión Ind. P.R. v. J.P.*, supra, pág. 130; *Henríquez v. Consejo Educación Superior*, 120 D.P.R. 194, 210 (1987); *Murphy Bernabé v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975).

[55] *Rivera Concepción v. A.R.Pe.*, supra; *Com. Vec. Pro-Mej., Inc. v. J.P.*, supra, pág. 761; *Misión Ind. P.R. v. J.P.*, supra, pág. 130; *Henríquez v. Consejo Educación Superior*, supra, pág. 210.

[56] Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2175; Art. 17(e) de la Ley Orgánica del

Con relación a las determinaciones de hecho de una agencia administrativa, esta Curia ha resuelto que estamos obligados a sostener tales determinaciones si están respaldadas por evidencia suficiente que surja del expediente administrativo considerado en su totalidad.[57] Hemos definido *evidencia sustancial* como aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión.[58] El tribunal debe considerar la evidencia en su totalidad, tanto la que sostenga la decisión administrativa, como la que menoscabe el peso que la agencia le haya conferido.[59] Como explicáramos en *Reyes Salcedo v. Policía de P.R.*, 143 D.P.R. 85, 95 (1997), la norma de la evidencia sustancial ... persigue evitar la sustitución del criterio del organismo administrativo en materia especializada por el criterio del tribunal revisor.[60] Conforme a la referida norma, el tribunal limita su intervención a evaluar si la decisión administrativa es razonable.[61] En caso de que exista más de una interpretación razonable de los hechos, el tribunal debe sostener la que seleccionó la agencia, y no sustituir su criterio por el de ésta.[62]

Por otra parte, las conclusiones de derecho pueden ser revisadas en todos sus aspectos por el tribunal.[63]

---

Departamento de Asuntos del Consumidor, 3 L.P.R.A. sec. 341p(e); *Rivera v. A & C Development Corp.*, supra, págs. 460–461.

[57] *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 D.P.R. 70, 75 (2000). Véanse, además: *Costa, Piovanetti v. Caguas Expressway*, 149 D.P.R. 881 (1999); *Misión Ind. P.R. v. J.P.*, supra, pág. 131; Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, *supra*.

[58] *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.*, 144 D.P.R. 425, 437 (1997); *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, supra; *Misión Ind. P.R. v. J.P.*, supra, pág. 131; *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670, 687 (1953).

[59] *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.*, supra, pág. 437; *Misión Ind. P.R. v. J.P.*, supra, pág. 131; *Hilton Hotels v. Junta Salario Mínimo*, supra, pág. 686.

[60] Ver también *P.R.T.C. v. J. Reg. Tel. de P.R.*, 151 D.P.R. 269 (2000).

[61] *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.*, supra, pág. 437.

[62] *Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R.*, supra, pág. 437; *J.R.T. v. Línea Suprema, Inc.*, 89 D.P.R. 840, 849 (1964).

[63] Art. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, *supra; O.E.G. v. Rodríguez*, 159 D.P.R. 98 (2003); *P.R.T.C. v. J. Reg. Tel. de P.R.*, supra.

No obstante, esto no significa que al ejercer su función revisora, el tribunal pueda descartar libremente las conclusiones e interpretaciones de derecho de la agencia y sustituir el criterio de ésta por el propio.([64]) Los tribunales le reconocen gran peso y deferencia a las interpretaciones hechas por las agencias administrativas de las leyes de las que son custodios.([65]) Dicha deferencia judicial al *expertise* administrativo, sin embargo, cede ante una actuación irrazonable o ilegal.([66]) La interpretación de la agencia también cede cuando ésta produce resultados incompatibles o contrarios al propósito del estatuto interpretado y a su política pública.([67])

En *Rivera v. A & C Development Corp.*, supra, resolvimos que la conclusión de D.A.Co. respecto a que en un caso particular se configura la ruina funcional que hace aplicable el Art. 1483 del Código Civil, *supra*, constituye una determinación mixta de hecho y de derecho. Por lo tanto, dicha determinación se trata como una conclusión de derecho, revisable en todos sus aspectos por los tribunales apelativos. En el caso de autos, el Tribunal de Circuito de Apelaciones, en su Resolución de 27 de abril de 1999, revisó en todos sus aspectos la conclusión de D.A.Co. de que la residencia en controversia se encontraba en estado de ruina funcional. El referido foro concluyó lo siguiente:

> Como puede apreciarse de las partes citadas del informe [emitido por el ingeniero Caballero], considerados conjuntamente y en su totalidad, según fueron identificados y descritos en éste y consignados en la resolución original emitida por el

---

([64]) *P.R.T.C. v. J. Reg. Tel. de P.R.*, supra; *Misión Ind. P.R. v. J.P.*, supra, pág. 132.

([65]) *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, supra; *Comisionado de Seguros v. Antilles Ins. Co.*, 145 D.P.R. 226, 233 (1998); *Rivera v. A C Development Corp.*, supra, pág. 461; *Calderón v. Adm. Sistemas de Retiro*, 129 D.P.R. 1020, 1042 (1992); *De Jesús v. Depto. Servicios Sociales*, 123 D.P.R. 407, 417–418 (1989).

([66]) *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, supra; *Com. Vec. Pro-Mej., Inc. v. J.P.*, supra, pág. 761; *Comisionado de Seguros v. Antilles Ins. Co.*, supra, pág. 233.

([67]) *Costa, Piovanetti v. Caguas Expressway*, supra; *Mun. de San Juan v. J.C.A.*, 149 D.P.R. 263 (1999); *Calderón v. Adm. Sistemas de Retiro*, supra, pág. 1042; *De Jesús v. Depto. Servicios Sociales*, supra, pág. 418.

> DACO a base de la prueba incontrovertida presentada por los Pachecho-Rodríguez, los desperfectos descritos no comprometen la solidez o estabilidad del edificio. Sin embargo, constituyen una ruina funcional de la residencia, por afectar seriamente la utilización y disfrute del inmueble y, sin lugar a dudas, exceder las imperfecciones que podían esperarse en una residencia nueva. Atendida la prueba desfilada, constituyen conjuntamente elementos de la ruina funcional de la vivienda y causan perjuicio considerable.([68])

Por lo tanto, el referido tribunal determinó que el remedio concedido por D.A.Co. en la resolución original era el procedente, por lo que revocó la resolución emitida en reconsideración y reinstaló el dictamen original. El peticionario no nos ha colocado en posición de intervenir con la presunción de regularidad y corrección que cobija las actuaciones y decisiones del Tribunal de Circuito de Apelaciones. Por lo tanto, la decisión recurrida debe sostenerse.

## VII

Por los fundamentos antes expuestos, *procede confirmar la sentencia dictada por el Tribunal de Circuito de Apelaciones.*

*Se dictará sentencia de conformidad.*

El Juez Presidente Señor Andréu García concurrió y disintió con una opinión escrita. El Juez Asociado Señor Fuster Berlingeri concurrió con el resultado sin opinión escrita. La Jueza Asociada Señora Naveira de Rodón no intervino.

---

([68]) Apéndice, pág. 214.

— O —

Opinión concurrente y disidente en parte emitida por el Juez Presidente Señor Andréu García.

En el caso de autos, la opinión del Tribunal extiende la protección del segundo párrafo del Art. 1483 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 4124, para reclamar por vicios aparentes que no son causa de la ruina del edificio. Por estimar que incide el Tribunal al resolver de esa forma, nos vemos obligados a disentir en parte.

I

Mediante contrato de compraventa efectuado el 18 de enero de 1995, los esposos Ramón Pacheco Torres y Claribel Rodríguez Canchani adquirieron de Estancias de Yauco, S.E. y de Yauco Excavation Contractors, Inc., una vivienda en la urbanización Estancias de Yauco. Antes de aceptarla, los compradores inspeccionaron la propiedad al menos dos veces. En abril de 1998, luego de adquirida la propiedad, contrataron a un ingeniero para que hiciera un estudio de niveles en la residencia, ya que el agua se estancaba en el área de la marquesina. El estudio reveló las siguientes fallas de construcción: (1) descuadre en los dormitorios y las diferentes dependencias de la casa, reflejado en las losetas y paredes de la residencia; (2) exceso de un cuatro por ciento del máximo permitido en la pendiente del garaje, el cual es de catorce por ciento; (3) ausencia de escalera en la entrada de la casa (en el área del *foyer*), y (4) existencia de un muro de contención en la parte posterior del solar que no consta en los planos.

El 27 de abril de 1998 el señor Pacheco y la señora Rodríguez presentaron una querella ante el Departamento de Asuntos del Consumidor (D.A.Co.) en la que alegaron que la residencia adolecía de los vicios señalados en el estudio realizado por el ingeniero. Solicitaron que se corrigieran los vicios subsanables y que se les compensara por los vi-

cios insubsanables. Un inspector de D.A.Co. realizó una inspección de la residencia, comprobó la existencia de tales defectos y estimó que las reparaciones costarían $26,760.25. D.A.Co. emitió una Resolución el 27 de abril de 1999, mediante la cual determinó que Estancias de Yauco, S.E. y Yauco Excavation Contractors, Inc. eran responsables por los vicios de construcción que sufría la residencia de acuerdo con las disposiciones del Art. 1483 del Código Civil, *supra*. Ordenó el pago de $4,655 por concepto de depreciación del valor de la residencia.

Posteriormente, D.A.Co. reconsideró su dictamen y determinó que los vicios consistentes en el descuadre en el piso y las paredes, y en el desnivel en la marquesina eran de carácter aparente, por lo cual no aplicaba el Art. 1483 del Código Civil, *supra*, y la acción para reclamar por tales vicios no procedía bajo la Ley Núm. 130 de 13 de junio de 1967, según enmendada, 17 L.P.R.A. sec. 501 *et seq.*, y bajo el reglamento aprobado por D.A.Co.,[1] debido a que la reclamación se debió de hacer en el plazo de dos años. Sin embargo, D.A.Co. determinó que la falta de la escalera del *foyer* que aparecía en los planos aprobados por la Autoridad de Reglamentos y Permisos (A.R.Pe.) y la existencia del muro de contención que no aparecía en el *plot plan*, constituían una violación contractual. La reclamación por tal incumplimiento no había caducado, ya que tenía un plazo de quince años. Se ordenó una compensación de $800 a los querellantes.

Inconformes con tal determinación, tanto los vendedores como los compradores acudieron ante el Tribunal de Circuito de Apelaciones mediante sendos recursos de revisión. Luego de consolidar ambos recursos, el foro apelativo emitió una sentencia el 28 de agosto de 2000, mediante la cual revocó la resolución recurrida e instauró la originalmente emitida por la agencia administrativa. Des-

---

[1] Reglamento para Regular las Distintas Actividades que se Llevan a Cabo en el Negocio de la Construcción de Viviendas Privadas en Puerto Rico, Reglamento Núm. 2268 del Departamento de Asuntos del Consumidor, aprobado el 17 de agosto de 1977.

pués de haber sido denegada la moción de reconsideración presentada por los vendedores, éstos acudieron ante nos señalando que erró el Tribunal de Circuito de Apelaciones "al aplicar el Artículo 1483 del Código Civil y al determinar que las condiciones de la residencia equivalen a una ruina funcional". Petición de *certiorari*, pág. 8.

## II

Coincidimos con la conclusión de la mayoría del Tribunal al efecto de que la residencia en cuestión se encuentra en estado de ruina funcional, requisito necesario para activar la garantía decenal del Art. 1483 del Código Civil, *supra.* Concurrimos también con la determinación de la mayoría sobre los vicios ocultos. Sin embargo, entendemos equivocado el razonamiento de la mayoría mediante el cual se aplica el segundo párrafo del Art. 1483 del Código Civil, *supra*, a los vicios aparentes que no causan la ruina del edificio. Por considerar que la causa de acción por incumplimiento contractual contemplada en dicho estatuto no procede en el caso de autos, disentimos.

La regla de la responsabilidad decenal (primer párrafo del Art. 1483 del Código Civil, *supra*) se aplica al caso del edificio que se arruina por vicios de la construcción o de la dirección, debido al mal cumplimiento de la obligación por falta de aplicación de la pericia exigible de los obligados. La regla de la responsabilidad quincenal (segundo párrafo del mismo artículo) se refiere al caso más genérico de ruina causada por incumplimiento de las condiciones del contrato por parte del contratista. P. Salvador Coderch, *Comentario del Código Civil*, Secretaría General Técnica, Centro de Publicaciones, Madrid, 1991, T. II, pág. 1189. La doctrina discute si el fundamento de la responsabilidad es legal o contractual.[2]

---

[2] La tesis contractualista es seguida, entre otros autores, por J.M. Manresa y Navarro, *Comentarios al Código Civil Español*, Madrid, Ed. Reus, 1950, T. X, pág. 199. En la misma línea se encuentra L. Díez-Picazo, *Estudios sobre la Jurisprudencia Civil*, Madrid, Ed. Tecnos, 1966, Vol. I, pág. 629.

Herrera Catena estima que se trata de una responsabilidad *ex lege* a la que habrá que aplicar, supletoriamente, el régimen contractual.(³) Esto significa que tales obligaciones son exigibles cuando existe un contrato de ejecución de obra y no figuren en una de sus cláusulas, toda vez que el Art. 1210 del Código Civil, 31 L.P.R.A. sec. 3375, preceptúa que los contratos obligan "no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". Igualmente lo son cuando no exista un contrato de ejecución de obra, pues la función desempeñada es la determinante de la responsabilidad.

Nos encontramos, en definitiva, dentro de las exigencias de la *lex artis*, y no en el marco del incumplimiento específico de una cláusula contractual que constituye el ámbito del párrafo segundo del citado Art. 1483.(⁴)

La doctrina española ha prestado escasa atención a la naturaleza jurídica de las responsabilidades del segundo párrafo del Art. 1591 del Código Civil español, equivalente al Art. 1483 del Código Civil de Puerto Rico, *supra*. En general, el Art. 1591 es considerado en su conjunto, sin distinción entre las responsabilidades nacidas de uno y otro párrafo.(⁵)

Uno de los pocos autores que ha estudiado con más detenimiento el precepto en cuestión es G. García Cantero, quien subraya que para interpretar debidamente el segundo párrafo del Art. 1591, "hay que tener en cuenta que dicho segundo párrafo constituye una oración elidida que debe completarse con el primero", y que la frase debe que-

---

(³) J. Herrera Catena, *Responsabilidad en la construcción: responsabilidad decenal de técnicosos y constructores*, Granada, Gráficas del Sur, 1974, Vol. I, pág. 195.

(⁴) Íd., págs. 199–200.

(⁵) Así, Manresa utiliza un lenguaje contractualista —refiriéndose al precepto en su conjunto— que sólo conviene al segundo párrafo del Art. 1591. Manresa y Navarro, *op. cit.*, págs. 921 y 922. Mucius Scaevola lo contempla expresamente y lo conceptúa como una "excepción punitiva al plazo de garantía", poniendo de relieve que no tenía precedente en el Proyecto de Código Civil de 1851 y estimándolo innecesario, pues toda falta contractual (que sea causa de la ruina total o parcial de la obra) implicaría un vicio constructivo (ya sancionado en el primer párrafo del Art. 1591). M. Scaevola, *Código Civil*, Madrid, Ed. Reus, 1951, T. XXIV, págs. 103–104.

dar así: "Si la causa de la ruina del edificio fuere la falta del contratista a las condiciones del contrato, la acción de indemnización durará quince años". La expresión "condiciones del contrato" utiliza un término no técnico, con el que quiere aludirse al pliego de condiciones del contrato de obra. Se trataría, por lo tanto, de un *incumplimiento cualificado del contrato*, y en tal sentido dicha norma vendría a ser una aplicación tipificada del Art. 1101 (Art. 1054 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3018). Continúa diciendo García Cantero que se trata de incumplimiento *específico*; no bastaría cualquier clase de incumplimiento, sino el cualificado por su resultado, es decir, por haber originado la ruina del edificio construido. Sin embargo, dicha ruina ha de provenir, precisamente, de la falta del contratista a las condiciones del contrato.[6]

Gullón Ballesteros plantea la necesidad de una *integración* de dicho segundo párrafo, y precisa que se trata de una ruina producida "por no haberse cumplido *específicamente* lo pactado en el contrato de obra".[7]

Herrera Catena sostiene que se trata de un párrafo oscuro, pero no inútil, que sanciona contravenciones *específicamente contractuales* y que constituye una "excepción punitiva" al plazo de garantía establecido en el primer párrafo del propio Art. 1591 (que amplía a 15 años), cuando la causa de la ruina sea "la falta del contratista a las condiciones del contrato". El primer párrafo del Art. 1591 establece obligaciones de origen legal que sancionan los incumplimientos de la *lex artis*, mientras que el segundo párrafo se refiere a incumplimientos específicos de las cláusulas contractuales y opera cuando la situación fáctica supone vicio constructivo con arreglo a la *lex artis* y, *además*, falta contractual.[8]

En *Federal Ins. Co. v. Dresser Ind., Inc.*, 111 D.P.R. 96,

---

[6] G. García Cantero, *La responsabilidad por ruina de los edificios*, 16 An. Der. Civ. 1053, 1110 (1963).

[7] A. Gullón Ballesteros, *Curso de derecho civil: contratos en especial, responsabilidad extracontractual*, Madrid, Ed. Tecnos, 1968, pág. 269.

[8] Herrera Catena, *op. cit.*, pág. 219.

107–108 (1981), aceptamos la interpretación más generalizada de la doctrina española, según la cual el segundo párrafo del Art. 1483 constituye una excepción punitiva al plazo decenal y que tiene una acepción muy restringida. Resolvimos entonces que

> ... para poder invocar el plazo de caducidad mayor *deberá probarse que la violación a una cláusula concreta del contrato o sus especificaciones fue la causa directa de la ruina del edificio.* La carga de la prueba le corresponde al dueño o legitimado activo. ... Por tratarse de un cláusula punitiva, que tiene el extraordinario efecto de ampliar el plazo decenal, la prueba no podrá fundarse en simples inferencias derivables .... La falta del contratista tiene que ser probada por el comitente. (Énfasis suplido.) *Federal Ins. Co. v. Dresser Ind., Inc.,* supra, pág. 108.

La doctrina establecida en *Federal Ins. Co. v. Dresser Ind., Inc.*, supra, la reafirmamos más recientemente en *Zayas v. Levitt & Sons of P.R., Inc.*, 132 D.P.R. 101, 111–113 (1992), y añadimos que además resulta indispensable probar la existencia de un contrato de obra o de construcción para que surja una causa de acción bajo el segundo párrafo del Art. 1483 del Código Civil, *supra.*

## III

El vicio o los vicios ruinógenos serán, muchas veces, ocultos en el sentido del Art. 1373 del Código Civil, 31 L.P.R.A. sec. 3841, pero no por ello quedarán exentos de la acción por ruina; antes bien, esta es una garantía reforzada del adquirente de la obra que se explica por el hecho de que el mal cumplimiento de las obligaciones de realizar o dirigir la obra no suelen revelarse inmediatamente.

El tema de la recepción de obra es singularmente importante en la aplicación del segundo párrafo del Art. 1483, *supra.* Dado que éste contempla "la falta del contratista a las condiciones del contrato" como causa de la ruina, es obvio que la recepción de obra (que implica un reconocimiento de que ésta se admite por estar de acuerdo con el contrato) tendrá un singular relieve cuando se trate de res-

ponsabilidades derivadas del referido segundo párrafo del Art. 1483.[9]

¿Cubre la recepción definitiva los vicios ruinógenos aparentes? Esta interrogante ha dado lugar a dos posiciones sobre el particular: la que considera que la recepción definitiva *cubre* los vicios ruinógenos *aparentes* y deja en pie la responsabilidad por los vicios ruinógenos ocultos, y la que estima que la recepción definitiva no *cubre* ningún vicio ruinógeno (ni aparente ni oculto).

Herrera Catena, siguiendo a Manresa y a García Cantero, sostiene que tratándose de vicios ruinógenos nos encontramos ante la aplicación de normas de orden público, que impiden el efecto liberatorio de la recepción definitiva, incluso para los vicios aparentes en el momento de recibir la obra. Expresa este autor que cuando se trata de vicios ruinógenos es irrelevante la distinción entre vicios ocultos y aparentes. Si el contratista y el arquitecto responden ante terceros, aunque se trate de un vicio aparente en el momento de la recepción de obra, no es porque el primer párrafo del precepto contenga obligaciones de origen extra-contractual, sino porque el Art. 1809 del Código Civil, 31 L.P.R.A. sec. 5148, se remite al citado Art. 1483 en sus dos párrafos, y no sólo a su párrafo primero, al preceptuar que

> [s]i el daño de que tratan [los dos artículos anteriores —ruina del 1807 y daños relacionados del 1808—] resultare por defecto de construcción, el tercero que lo sufra sólo podrá repetir contra el arquitecto o, en su caso, contra el constructor, dentro del tiempo legal.

Es indiferente que la causa (para responder ante terceros) sea una de las detalladas en el primer párrafo del Art. 1483 o "la falta del contratista a las condiciones del contrato" a que se refiere el segundo párrafo de este precepto, puesto que el genérico "defecto de construcción" del Art. 1809 se concreta en todas y cada una de las causas de

[9] La recepción "viene constituida por el acto o la manifestación del propietario, reconociendo que la obra ha sido ejecutada correctamente". S. de 14 de octubre de 1968, Núm. 4386, XXXV (Vol. II) Repertorio de Jurisprudencia 2944.

ambos párrafos del Art. 1483. El segundo párrafo del Art. 1483 no viene a contradecir la doctrina tradicional sobre el carácter liberatorio de la recepción de obra, sino que, por el contrario, constituye uno de los supuestos de *excepcionalidad* (al principio general liberatorio) en que se desenvuelve dicho precepto, aunque tenga un sentido *punitivo* y de agravación (respecto al párrafo primero) la ampliación del plazo de garantía al de 15 años, que ya existía en el derecho romano y en la Ley de Partidas.

Salvador Coderch señala, por su parte, que las reglas de los vicios ocultos son propias de los contratos onerosos y no ve razón para rechazar la acción de vicios del adquirente que los denuncia en tiempo y forma. Por eso, quizá, la jurisprudencia española ha seguido una orientación pragmática. En ocasiones ha señalado que las acciones de vicios, de ruina y de incumplimiento son compatibles entre sí y cabe optar por una de ellas. Otras veces, y para rechazar la caducidad de la acción de vicios ocultos —por haberse ejercitado transcurridos los seis meses desde la entrega— se ha afirmado que el Art. 1591 es derecho especial en relación a la regulación general de los defectos ocultos, o que no opera el Art. 1490 (Art. 1379 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3847) porque en el Art. 1541 hay un caso de inhabilidad del objeto, o que los vicios ruinógenos gozan de autonomía en relación a los ocultos, o que aquéllos suponen, además, incumplimiento. Entre estas doctrinas predomina en los últimos tiempos la que recalca que estos vicios que acarrean ruina e incumplimiento están sujetos al régimen especial del Art. 1591 y al régimen general del incumplimiento obligacional en vez del establecido en el Art. 1484 *et seq.* (Art. 1373 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3841 *et seq.*). Dicho autor concluye que la responsabilidad por vicios aparentes se extingue con la entrega, pero no se considerarán como tales aquellos de carácter ruinógeno cuya gravedad no pudiera ser todavía apreciada. Salvador Coderch, *op. cit.*, pág. 1192.

Sin embargo, en el ámbito de los vicios no ruinógenos, las cosas ocurren de otra forma. Al no existir las aludidas normas de orden público (obstaculizadoras del indicado efecto liberatorio de la recepción definitiva), cobra singular relieve la distinción entre vicios ocultos y aparentes a la hora de establecer responsabilidades por los no ruinógenos con posterioridad a la recepción de la obra.[10]

La recepción de obra constituye un acto jurídico distinto de la convención inicial. La recepción de obra sin reserva libera al contratista de los vicios *aparentes* no ruinógenos.

Podemos concluir, sin duda, como lo hace Herrera Catena que el Art. 1483 del Código Civil sólo contempla los vicios ruinógenos.[11] Y esto impide el efecto liberatorio de la recepción de la obra, incluso para los vicios aparentes en el momento de recibir la obra.

En este sentido, estamos de acuerdo con la opinión de la mayoría cuando expresa que el Art. 1483 del Código Civil no hace distinción entre vicios ocultos y aparentes a la hora de imponer responsabilidad al contratista por la ruina de un edificio, a pesar de lo expresado en *Constructora Bauzá, Inc. v. García López*, 129 D.P.R. 579 (1991), y en *González v. Agostini*, 79 D.P.R. 510 (1956).

## IV

La mayoría concluye que la ausencia de la escalera que debió de dar acceso al *foyer* y la existencia del muro de contención de la parte posterior de la residencia constituyen vicios aparentes, pero que el contratista no se liberó de su responsabilidad por éstos con la recepción de la obra por constituir una violación "a las condiciones del contrato", conforme establece el segundo párrafo del Art. 1483 del Código Civil, *supra.*

---

[10] Herrera Catena, *op. cit.*, págs. 86–101.

[11] Íd., pág. 132.

Considero que esta conclusión es claramente errónea, porque para responsabilizar al contratista por tales defectos habría que sostener que éstos son vicios ruinógenos. No existe prueba alguna para sostener que la ausencia de la escalera y la existencia del muro de contención sean vicios que produjeran la ruina del edificio. Al ser así, la responsabilidad del contratista queda fuera del alcance del Art. 1483 del Código Civil, *supra*. Por otra parte, por tratarse de vicios aparentes *no ruinógenos*, es aplicable la regla general, según la cual la responsabilidad del contratista cesa una vez entregada la obra.

Por este motivo, disiento de esta parte de la sentencia del Tribunal y los fundamentos de la opinión que la sostienen.